## THE MOHLER.

1. Where, in a high or uncertain state of the wind, a vessel is approaching a part of the river in which there are obstructions to the navigation— as, *ex. gr.*, the piers of a bridge crossing it—between which piers she cannot, if the wind is high or squally, pass without danger of being driven on one of them, it is her duty to lie by till the wind has gone down, and she can pass in safety.
2. The officers of steamers plying the Western waters must be held to the full measure of responsibility in navigating streams where bridges are built across them.

APPEAL in admiralty from a decree of the Circuit Court for the Eastern District of Wisconsin.

The Home Insurance Company of New York was the insurer of a cargo of wheat shipped on a barge appurtenant to the steamer Mohler, on the 12th of May, 1866, at Mankato, on the Minnesota River, in the State of Minnesota— the river then being high—and destined to St. Paul, on the Mississippi. The bill of lading contained the usual exception of "the dangers of navigation." The barge was wrecked by collision with one of the piers of a bridge just above the city of St. Paul, at about eight o'clock, on the evening of the day on which the voyage began, and was totally lost.*

---

* The bridge and piers are the same referred to, *supra*, p. 1, in *The Lady Pike*.

The insurance company paid the loss, and filed its libel in the District Court to recover the amount under its right of subrogation.

The answer set up that the accident occurred through a sudden and unexpected gust of wind which overtook the boat as she was about passing through the piers, and that she was, therefore, not answerable for the consequences of the collision.

The case was heard on the testimony introduced by the respondents, the libellant having called no witnesses.

The weather, in the morning of the day when the boat set off, was calm; but during the afternoon became rough and windy, so much so that the boat laid up at Mendota, near the mouth of the Minnesota River, and about four miles above the piers, on account of the wind. After sundown—that is to say, a few minutes after seven o'clock—she proceeded on her voyage, the wind having "abated," as the master said, or, according to the testimony of the mate, having "calmed down some." At eight the barge struck the pier, killing a man on board and sinking the barge. The night was starlight, and the piers had signal lights upon them.

On the trial there was great discrepancy between the testimony of the master and that of the mate, as to the condition of the wind after the boat left Mendota. The master swore that there was no wind to affect the boat until the Julia, an ascending boat, got near the Mohler; while the mate said that the wind rose after the Mohler left Mendota, and blew hard by spells all the way down. They also disagreed as to the point where the Julia was met, the master saying that it was not more than a quarter of a mile above the piers, while the mate fixed the distance at one and a half miles.

From Mendota down to within a short distance of these piers, high bluffs, it should be stated, line the sides of the river, and prevent boats feeling or being affected by the wind, but that just before reaching the piers the bluffs recede from the river and open so as not to operate as a pro-

tection from the wind; and that on reaching this point wind will be felt, and sometimes very strongly, though before arriving at this point it would not be. On coming near to these parts there was no doubt that the wind had not gone down, and that it was from a dangerous quarter, the south; the river here running east and a south wind tending to drive a boat on a pier.

"When we came within about half a mile of the piers," said the pilot, "gusts came at times hard enough to split the posts of fences; but they lulled. Then a heavy gale struck us four or five lengths above the piers. We could not have then changed our course or made a landing. Everything possible to prevent a collision was done; but the collision was inevitable."

An expert witness—of the respondent's, of course—on cross-examination testified that within a quarter of a mile, or even less, the steamer and her tow could have rounded to and landed, even in a hard wind from the south; and that not to do so in such a case would be bad seamanship.

Other witnesses testified that these piers increase the danger of the navigation; that vessels were very liable to be driven against such obstructions; that extraordinary precaution was necessary in going through them, and then, that "a man is liable to be beat at it."

Both the District and the Circuit Court held that the officers of the steamer were guilty of a wrongful act in attempting to pass between the piers of the bridge in the state of the weather at the time; and condemned the steamer. From this condemnation her owners appealed.

*Mr. J. W. Cary, for the appellants,* argued that it was plain from the fact that the vessels had put into Mendota for the exact purpose of *not* running while there was high wind, that all evidences of high wind must have disappeared before the vessels came out; that no wind did, in fact, disturb them until they got to where the bluffs recede; that there, from the physical configuration of the land, occasional gusts of wind might come unexpectedly through the gaps, as

through a funnel, though no high wind were stirring; that such was the case here; and that where a sudden gust did come through such a place, it was a true peril of navigation.

*Mr. N. J. Emmons, contra.*

Mr. Justice DAVIS delivered the opinion of the court.

It is insisted that the loss occurred through a peril of navigation, which was one of the exceptions contained in the bill of lading, and that, therefore, the carrier was excused from a delivery of the wheat. The burden of proof lies on the carrier, and nothing short of clear proof, leaving no reasonable doubt for controversy, should be permitted to discharge him from duties which the law has annexed to his employment. This burden has been assumed by the carrier, and the case was heard on the testimony introduced by the respondents, the libellant having called no witnesses.

It may be true, as the answer implies, that the boat would have safely made the passage if the wind had not driven her against the pier, but this does not solve the difficulty. The inquiry is whether the passage should have been undertaken at all in the general bent of the weather on that day. If the carrier had sufficient warning to put him on his guard, and chose to neglect it and take the chances of a venture when common prudence told him there was danger in it, he cannot escape on the ground that the particular peril which finally overcame him was a sudden gust of wind. The general doctrine that a carrier is not answerable for goods lost by tempest has no application to such a case.

It is undeniable that the weather was boisterous during the afterpart of the day on which the loss occurred, and that the boat laid up at Mendota, on account of the wind. It had at best only "abated" or "calmed down" when she left Mendota and proceeded on her voyage. There is a singular discrepancy in the testimony of the master and the mate as to the condition of the wind after the departure from Mendota, and as to where it was that the wind began

to blow hard; the master swearing that there was no great wind until the boat met the Julia, and that this was but a quarter of a mile above the piers; the mate giving a very different account as to both facts. Both these officers had equal opportunities of judging, and there is nothing in the record affecting the credibility of either. In such a case the defence fails, for the respondents have no right to ask the court to prefer the testimony of one witness over the other when there is nothing in the record to show that one is more reliable than the other.

Apart from this there is enough in the evidence to establish satisfactorily that the weather had not cleared, nor the direction of the wind changed, and that the boat should either not have left her moorings at Mendota, or have landed at some proper point before the piers were reached. It won't do to say that the wind had moderated, and that the officers of the boat thought they could get through without trouble. They had no right to think so, for on such a day squalls were likely to arise at any moment, and it was bad seamanship, being forewarned, to attempt to go through such a dangerous place in the river. It is difficult at all times to make the passage of these piers, and especially so in sudden gusts of wind blowing from the south, which was the case on that day. And this difficulty is enhanced in the night-time, and when the current, by reason of high water, is increased.

Any prudent officer would have stopped until the weather became calm. At any rate it was the duty of the master of the boat in question to have done so, and, failing in this duty, he is chargeable with the consequences of his negligence, which, in this case, were lamentable, for not only was the property in his charge destroyed, but a human life lost. The officers of steamers plying the Western waters must be held to the full measure of responsibility in navigating streams where bridges are built across them. These bridges, supported by piers, of necessity increase the dangers of navigation, and river-men, instead of recognizing them as lawful structures built in the interests of commerce,

seem to regard them as obstructions to it, and apparently act on the belief that frequent accidents will cause their removal. There is no foundation for this belief. Instead of the present bridges being abandoned, more will be constructed. The changed condition of the country, produced by the building of railroads, has caused the great inland waters to be spanned by bridges. These bridges are, to a certain extent, impediments in the way of navigation, but railways are highways of commerce as well as rivers, and would fail of accomplishing one of the main objects for which they were created—the rapid transit of persons and property—if rivers could not be bridged. It is the interest as well as the duty of all persons engaged in business on the water routes of transportation to conform to this necessity of commerce. If they do this and recognize railroad bridges as an accomplished fact in the history of the country, there will be less loss of life and property, and fewer complaints of the difficulties of navigation at the places where these bridges are built. If they pursue a different and contrary course, it rests with the courts of the country, in every proper case, to remind them of their legal responsibility.

DECREE AFFIRMED.