# MARY K. ALMY vs. COTTON BROTHERS AND COMPANY.

## September 15, 1904.

*Contract.—Implication*: A lease of a house-boat reciting its location at date of lease and containing a stipulation to return it in good order, etc., at termination of lease and without stating the place of delivery, is an implied agreement to return it at the location it was in at inception of lease.

*Measure of Care and Skill*: Measure of care and skill avoiding responsibility for accident is that which one of ordinary prudence would use in his own case.

*Same*: Care and skill required in an enterprise involving danger is such as is reasonable considering the conditions and the peculiar circumstances and emergencies of the case.

*Negligence.—Towage Contract.—Tort*: One undertaking to tow does not incur liabilities of insurer or common carrier, but is liable for negligence in not exercising such care and skill as the weather and condition of the tow reasonably require for safety; such liability not dependent on towage contract, but may be founded on tort.

*Same.—Towage*: Procceeding to tow when the weather renders the enterprise unsafe is negligence.

*Same.—Accident*: An accident is sometimes evidence of negligence.

*Same.—Gratuitous Bailment*: Want of necessary skill and care is negligence if mandatary so undertakes the service as to be bound to finish it.

*Liability —Unavoidable Accident*: No responsibility for injuries resulting from unavoidable accident received in conduct of lawful business.

*Damages.—Rule of Maritime Insurance*: The rule of maritime insurance as to damages probably not applicable to a libel for damages for loss of vessel by negligence.

*Same.—Measure of*: Damages limited to the injury at the time of the accident.

In Admiralty: Libel in *Personam* for Damages for Loss of House-boat.

J. J. Dunne and A. S. Humphreys, Proctors for Libellant.

R. W. Breckons and Atkinson, Judd & Mott-Smith, Proctors for Libellees.

Dole, J. The libellant has brought this libel for damages for the loss of her house-boat which was wrecked on the open sea while the libellees were attempting to tow it from Pearl Harbor to the port of Honolulu, August 4th, 1903. The libel alleges that the accident was due to the carelessness and negligence of the libellees, and sets forth in particular the following conduct on their part as showing such carelessness and negligence:—*First.* The house-boat was placed in the same tow with two laden scows, all arranged in what is called a tandem tow, in which the house-boat followed the towing steamer and was followed by the two scows, one after the other, which, it is alleged, was, considering the state of the weather and the sea, and the nature of the construction and the plan of the house-boat, an improper and defective arrangement which was a proximate cause of the accident. *Second.* The careless and negligent selection by the libellees of the time in which the tow was attempted in relation to the conditions of wind and sea then prevailing which was a proximate cause of the said loss and damage. There was also a general allegation of carelessness and negligence in relation to the manner in which the tow was operated, but there being no evidence on this point of any special significance, I shall make no further allusion to it.

The libellees in their answer say in substance that they leased the house-boat from the libellant from January 1st, 1903, to July 29th, 1903, by a written lease, a copy of which is attached to the answer; that during all the times mentioned in the libel, H. N. Almy,—the husband of the libellant, was in charge and control of the house-boat and acting as her agent in regard to the same; that the value of the same was, up to the 4th of August, 1903, $1,500; that pursuant to the lease it became their duty at the termination thereof, on the 29th of July, 1903, to deliver the house-boat to libellant at Pearl Harbor, and that she was notified of such termination that she might take possession; that at such termination of the lease she requested the libellees to remove the house-boat to the port of Honolulu for her con-

venience; and that they thereupon agreed to do so but under the express stipulation that they should not be responsible for any loss or damage of or to the house-boat that might occur during such removal, and that pursuant to such agreement they proceeded to remove the same from Pearl Harbor to the port of Honolulu on the 4th of August, 1903. They admit that two laden scows formed a part of the same tow and allege due care and good seamanship in the construction thereof, and that a light breeze was blowing, the sea was smooth and there was no appreciable swell; that when the tow was near to Kalihi Channel the house-boat suddenly went over on one side and thereupon the libellees towed the same into shallow water and anchored her, and then proceeded to Honolulu with the scows and the persons who had been on the house-boat; that after reaching Honolulu the towing steamer returned to the house-boat and towed her to the port of Honolulu; that the turning over of the house-boat was not due to carelessness or negligence on the part of the libellees, but, as they were informed and believe, was due to the fact that the house-boat was not properly built into the scow but was simply tacked thereto with ten penny nails which became gradually loosened from the "rocking of the scow." They further allege that at no time after the 29th of July, 1903, were they or either of them in the sole possession or control thereof under or pursuant to the terms of the said lease. This position is however modified by the brief of counsel for libellees, in which (page 10) they say: "As a matter of accommodation "to the owner of the house-boat, the lessees waived their right "under the lease to have the boat returned to Pearl Harbor, and "undertook to deliver the house-boat at Honolulu." They further aver that the house-boat was not a total loss and that libellant has not suffered a loss of $2,500 as alleged in the libel.

The lease, made a part of their pleadings by the libellees, is not disputed by the libellant. It is dated January 1st, 1903, and was executed by the parties to this suit. The term of the lease is six months with the privilege of extension from month

to month for not over three months more. The lessees,—the libellees in this case, covenant to pay the rent; that they will not remove the house-boat from Pearl Harbor; that they will provide proper moorings; that they shall be liable for all damages to the house-boat from stranding or wreck; that in case of total loss of the house-boat they will pay to the lessees two thousand five hundred dollars, and that at the termination of the lease they will return her in good order and condition, ordinary wear and tear excepted, but withholding themselves from liability from damage by fire.

The claim of the libellees in their answer, that at the alleged termination of the lease on July 29th, they notified libellant of such termination, and that thereupon she requested them to deliver the house-boat at the port of Honolulu, and that they agreed to do so on the understanding that such removal to Honolulu should be at her risk, is modified by their testimony, in which Mr. Agassiz, one of the libellees, testified that about two months before the wreck of the house-boat, Mr. Almy asked him if when he was through with her he would tow her up to Honolulu for him, and he, Agassiz, agreed to do so as a favor to him but without taking "any responsibility on the tow," which was assented to by Mr. Almy. Mr. Almy in rebuttal denied that any such conversation or agreement had taken place, admitting, however, that he had asked Mr. Agassiz some time before July, when he expected to be through with the house-boat.

During the hearing and in their brief, the counsel for libellant repeatedly referred to the lease of the house-boat as containing provisions requiring her to be returned to the owner at Pearl Harbor at the termination of the lease. There is no such provision. The lease recites that at the date of its execution the house-boat was lying at Pearl Harbor and being silent as to the place of its return to the owner, the implication would be that it would be returned at Pearl Harbor, unless

some other arrangement should be subsequently made, which was the case.

The defense may be stated briefly as follows: There was no negligence or carelessness on the part of the libellees in relation to the attempted removal of the house-boat to Honolulu; the wreck of the same was caused by its own inherent weakness whereby it was unable to withstand the "gentle rocking incident to the towing;" that the service attempted to be performed by the libellees being gratuitous, or, as they describe it, "a matter of accommodation to the libellant," they cannot be held to "a high degree of care and prudence;" and the value of the house-boat at the time of the accident was only fifteen hundred dollars.

Much attention was given at the trial to the question of the construction of the tow, the opinion of expert witnesses being much divided. The following opinions were, however, favorably impressed upon my mind from this evidence, to wit: on the part of the libellant—the weaker vessel should come last in the tow because she would be more protected by the tow ahead of her, and because in the intermediate position with the towing steamer pulling ahead and the scows dragging behind there would be more strain; also it would have been safer to tow the house-boat by itself, because of the greater ease of handling one vessel in tow rather than several, and of favoring her in a sea way. On the part of the libellees:—a small craft towed behind a large one will tend to steady it like a rudder.

There was much contradictory evidence as to the size of the scows which were towed behind the house-boat, and whether or not they were laden in spite of the fact that the answer admits that they were laden scows. The weight of evidence as to their size supports the contention that they were small scows.

I attribute the disaster mainly to the rolling of the house-boat caused by the swell of the sea, and not to "the gentle rocking incident to the towing," as the counsel for the libellees contend. If the seams of the house-boat scow had opened from her having lain aground at one end for six months or more, as Mr.

Scott and Mr. Wheeler, two of the libellees' witnesses, said had happened, and she had taken in some water in consequence thereof after getting to sea, the presence of such water in her hull in any considerable quantity would inevitably have aggravated any tendency to roll caused by the waves. In the opinion of these two witnesses this was the proximate cause of the accident.

Mr. Dunn, a witness for the libellant, testifies to open air courses in the hull of the house-boat just below the platform on which the superstructure was placed. He thinks they were two or three inches wide and running nearly across the width of the hull. This testimony is denied by several witnesses for the defense, but as their testimony is negative in character it does not overthrow the positive testimony of Mr. Dunn.

There is no doubt that after the accident to the house-boat there was a considerable quantity of water in the hull, which would have been a proximate cause of the disaster if it had been present before that took place. If this water entered the hull through the air courses or otherwise at the time of the accident when the house-boat was in a partially capsized condition, its presence had no significance as to the questions at issue. The evidence is insufficient to prove that the water was present early enough to have had any influence in causing the injury. ·

Much attention was given by the defense at the trial to the theory that Mr. Almy was the agent of libellant, and therefore he had authority to contract with libellees to tow the house-boat to Honolulu at her risk. I understand from the brief of counsel for libellees that this point is now waived, that is, they now admit "that one may not make a contract relieving himself from "the result of his own negligence," and rely on their theory of the law, that in a case of a gratuitous bailment a high degree of care and prudence is not required by any principle of law. This being the case it becomes unnecessary to consider the question of Mr. Almy's authority as agent for libellant.

I find the facts in relation to this point to be, that under the

lease the libellees were entitled to deliver the house-boat at the end of the lease to the lessor at Pearl Harbor; that a subsequent agreement was entered into between the parties, changing the locality of delivery to Honolulu without charge, the allegation of the answer that after July 29th, the house-boat was not in the possession of the libellees under the lease, being unsupported by the evidence and inconsistent with the facts of the case.

Parsons has the following in regard to responsibility in the case of a gratuitous bailment:

"It may be gathered from the cases and from obvious reasons, that where the work to be done requires peculiar skill and care, and the mandatary undertakes it in such way as to be bound to go through with it, the want of the required skill and care would be negligence enough." *2 Parsons on Contracts, (6th Ed.)*, 106.

The law is clear that although one undertaking to tow does not assume the obligation of an insurer nor the liability of a common carrier, yet he must exercise that degree of care and skill which the circumstances of the weather and the condition of the tow reasonably require for the safe conduct of the enterprise, and his liability for negligence is not dependent on his towage agreement but may be based on tort.

"Liability of a tug for damage caused by negligent towage is founded on tort arising out of a duty imposed by law and independent of any contract made or consideration paid for the towage." *The Temple Emery,* 122 Fed. Rep., 180, 181; *The John G. Stevens,* 170 U. S. 113, 124.

Did the libellees exercise the care and precautions that the circumstances of weather and sea and the unusual and inherent weakness of the house-boat, as a craft in the open sea, required?

"No one is responsible for injuries resulting from unavoidable accident, whilst engaged in a lawful business." *The Nitro-Glycerine Case,* 82 U. S. 537.

Was the disaster which destroyed the house-boat unavoidable?

The Nitro-Glycerine case above cited offers the following standard of carefulness in such matters:

"The measure of care against accident which one must take to avoid responsibility, is that which a person of ordinary prudence and caution would use if his own interests were to be affected and the whole risk were his own."

I am of the opinion that the accident was not unavoidable and that the libellees failed in exercising the care and caution which the circumstances reasonably required and that the damage of the house-boat was due to such failure. Mr. Agassiz, one of the libellees, was fully acquainted with the character of the house-boat, having lived in her, and testified that she was constructed and suitable for transportation on inland waters only and not suitable for traffic on the ocean, and that the studding of the house part was attached to the scow by means of nails about the size of ten penny nails. He was familiar with the water between Pearl Harbor and Honolulu. Although he says he put off the tow for two days in order to get the favorable conditions which prevailed when it started, yet the wind was so strong during the afternoon the tow was attempted, according to Mr. Dunn, a disinterested witness, that the yacht he was sailing in closehauled near the tow, carried her lee rail in the water, and there was "a heavy swell on, which would make a "person not used to going to sea good and seasick." Mr. Scott said, "the water was perfectly smooth, there was not even a "swell." Mr. Wheeler said, "the water was smooth, of course "there was a small ocean swell," and admitted that there was enough motion to open up the seams that had become dried out above the water line, and, with the assistance of the water in the hull, to rock the house loose from the hull. The witness Strem said that the house was fastened to the hull with twenty penny nails and that the rocking of the house-boat loosened the fastenings of the house. These last three witnesses were introduced by the defense and were employes of the libellees at the time of the accident. With this evidence there is no doubt in

my mind that there was a swell that made it obviously danger-ous for the house-boat to go to sea.

The witness Dunn testified that from midnight to five o'clock A. M. was the best time for smooth water between Pearl Harbor and Honolulu under ordinary conditions. The witness Nielsen said, "When the trade winds settle down steady it always blows "pretty strong in the afternoon until about sundown. * * * "In southerly weather it is different." It was trade wind weather. The house part of the house-boat was a two-story structure, an edifice peculiarly unsuitable for being towed through a sea with such a swell as would cause it to roll to any appreciable extent. The witness Scott said, "I wouldn't have undertaken to tow her in such a swell." His evidence was, there was no swell. The sea was in such a condition as made it . dangerous to take it to sea, as the result proved.

"There may be cases in which the result is a safe criterion by which to judge of the character of the act which has caused it." *The Steamer Webb,* 81 U. S. 414.

"If the state of the weather made the trip unsafe it was respondent's duty to have waited for better weather." *The Mohler,* 88 U. S. 230; *Tucker v. Gallagher, et al.,* 122 Fed. Rep. 847.

That the inherent weakness of the house-boat was not such as to make it unsafe to take her to sea under any conditions is shown by the fact that she was towed from Honolulu to Pearl Harbor in the open sea by the libellees within a year before the accident.

The *Temple Emery* case cited above is instructive in relation to the questions raised in this. A firm hired a combined dredger and pile driver and undertook to tow it in the open water of the lake to the place where it was to be used. The scow was sixteen by fifty feet and five feet deep; at one end was the pile driver forty feet high; the dredging appliances were at the other end and the boiler and engine amidships, making a craft as unsuitable for standing the motion caused by a con-

siderable swell as the house-boat of this case. With this craft the tug-boat also took in tow two hundred boom sticks. The court found that the tow started without immediate necessity in unfavorable weather; that the tow line was attached to one corner of the scow only when it should have been attached to both by means of a bridle to prevent yawing, and that the boom sticks endangered the tow by keeping it exposed to rough water longer than would have been the case if the scow had been towed alone. She capsized and the pile driving and dredging attachments were lost. The court in holding the tug liable, said:

"The maritime skill and care thus called for is such as is reasonable in that service and under the conditions presented— such as may reasonably be demanded under 'the peculiar circumstances and emergencies of the case.' " 122 Fed. Rep. 182.

This test of responsibility is recognized in *The Joseph Peene,* 130 Fed. Rep. 489.

The libellant claims a total loss and damages of twenty-five hundred dollars, that being the damages agreed upon in the lease in case of a total loss. Counsel for the libellant have pressed this point under the rules of practice in maritime insurance. But it is doubtful if such rules can be applied to a case of this kind, and if they could, there has been no abandonment of what remained of the house-boat,—a scow in good condition, an indispensable condition of recovery for total loss in insurance cases. The United States reports have some cases of collisions in which a tendency is shown to approximate to the rule in marine insurance. *The Falcon,* 86 U. S. 75, shows this tendency perhaps the most conspicuously, but the fact that the answer admitted a total loss appears to have had some influence in this decision.

The measure of damages in this case is the injury to the house-boat at the time of the accident. Mr. Hughes, who built her, says the scow cost seven hundred dollars and that he would not undertake to put the house-boat back in her old condition

as originally constructed less the deterioration of the hull for less than two thousand dollars. Mr. Almy says the original cost was about twenty-two hundred and fifty dollars, and fitting her up for libellees' use cost nearly three hundred dollars more, making a total of twenty-five hundred and fifty dollars. Why the superstructure should now cost two thousand dollars when it originally cost but fifteen hundred and fifty, or eighteen hundred and fifty with the additions made, the scow having cost seven hundred dollars, was not explained. No evidence has been introduced as to deterioration of the house-boat and yet there must have been some. My estimate of the damages suffered by the libellant, is eighteen hundred and fifty-dollars, and a decree will be entered for that amount with costs.