STERN et al. v. FERNANDEZ et al.

(Circuit Court of Appeals, Ninth Circuit. March 18, 1915.)

No. 2409.

1. SHIPPING ⚙⟶132—LIABILITY FOR LOSS OF CARGO—CAPSIZING OF SAILING SCOW.

The capsizing of a scow schooner on the Sacramento river, and the loss of her cargo, when, owing to a sudden puff of wind, she sheered against the bank and struck a snag, which made a hole below the water line, *held*, on the evidence, not due to incompetency of the master, unseaworthiness, or improper stowage, but to a peril of navigation, for which the owner was not liable.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 471–487; Dec. Dig. ⚙⟶132.]

2. ADMIRALTY ⚙⟶118—REVIEW ON APPEAL—FINDINGS OF FACT.

On appeal in admiralty, when questions of fact are dependent on conflicting testimony, the decision of the District Judge, who heard and saw the witnesses, will not be reversed, unless it clearly is against the evidence.

[Ed. Note.—For other cases, see Admiralty, Cent. Dig. §§ 758–775, 794; Dec. Dig. ⚙⟶118.]

Appeal from the District Court of the United States for the First Division of the Northern District of California; Maurice T. Dooling, Judge.

Libel in personam by J. Stern and B. Fleischer, partners as J. Stern & Co., against Carlotta C. Fernandez and Thomas B. Fernandez, executrix and executor of the will of B. Fernandez, deceased, for loss of cargo. Decree for respondents, and libelants appeal. Affirmed.

Nathan H. Frank and Irving H. Frank, both of San Francisco, Cal., for appellants.

H. W. Hutton, of San Francisco, Cal., for appellees.

Before GILBERT and MORROW, Circuit Judges, and WOLVERTON, District Judge.

MORROW, Circuit Judge. The libel filed in the court below named one B. Fernandez as respondent, and it is alleged that on the 17th day of October, 1904, the libelants shipped on board the schooner Francis E. M. Bernard, then lying in the Sacramento river, in the state of California, bound on a voyage to the port of San Francisco, 1,008 sacks of beans; that owing to the unseaworthy condition of the vessel, and to the insufficient manning thereof, and to the negligence and carelessness of the respondent, the merchandise was, on the 17th day of October, 1904, totally lost and destroyed, whereby the libelants suffered damage in the sum of $2,377.05. Subsequent to the filing of the libel, Fernandez died, and the present appellees, Carlotta C. Fernandez and Thomas B. Fernandez, as executrix and executor of the last will and testament of B. Fernandez, were substituted as respondents.

[1] The Francis E. M. Bernard was a vessel of the type known as a scow schooner, about 45 feet long and 4 feet deep, with a beam of

⚙⟶For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

about 18 feet. She had a flat bottom, with round bilges, and a sharp bow. She carried two masts and three sails—a foresail, a mainsail, and a jib. It appears from the testimony that the beans were loaded on the Bernard at two different points on Minor's Slough, a tributary of the Sacramento river. The beans averaged about 85 pounds to the sack, making in all approximately 42.8 tons. Of this cargo, 125 sacks, or 5.62 tons, were stowed in the hold of the vessel in tiers or layers three sacks high, and the remainder, 37.18 tons, or 983 sacks, were stowed or piled on the deck in tiers or layers five sacks high. The vessel was manned by the captain, one Paul Ewald, and a deckhand. After all of the cargo had been loaded, the sails were hoisted and the Bernard proceeded down Minor's Slough on the return trip to San Francisco. The vessel had reached the mouth of the slough, distant about 200 yards from the point of making sail, when there came a change of wind. The vessel sheered off, ran into the bank of the stream, and in a few minutes capsized. Subsequent examination revealed a hole on the starboard side of the hull, below the water line, about three or four inches in diameter. The cargo was a total loss.

The libelants claim that the accident was due to the incompetency of the master, the incapacity of the vessel to answer her helm, or that the cargo was improperly stowed, and, if the accident was due to either of these causes, the vessel was unseaworthy, and the respondents liable for the loss. The respondents claim that the master was competent, that the failure of the vessel to answer her helm was due to the unusual condition of the wind, that the cargo was properly stowed, and that the accident was caused by a peril of navigation for which they were not responsible.

The captain's version of the accident was as follows:

"We set sail on Monday morning. We pulled across the river, and there was a westerly wind blowing. We set the mainsail and jib, and we started off for home, and I told the man to go forward and hoist the foresail, and a puff of wind came up from the northwest. The winds are pretty uncertain up the river. I had the helm hard down, and she sheered, and went into the bank there, and struck a snag there, or a rut, and she made a hole in her starboard bow. * * * After she struck, I know she acted funny right away, and I says to this man there must be something the matter with her. He says, 'I cannot see nothing the matter with her.' I tried to get her across the river to see what the trouble was with the boat, and before we got halfway she turned turtle, and I had just time enough to lower down the mainsail, foresail, and jib. Of course, at that time the man and I was overboard; the deck load shifted; the beans shifted—dumped over into the water. Of course, we was spilled into the water, and the man and I—we swam for the shore."

The contention of the libelants that the master was incompetent is based partly on the fact that the voyage during which their merchandise was lost was the first voyage of the Bernard in which Ewald had acted as captain or master; that he had not procured a license to act as such captain; that he had never theretofore acted in the capacity of captain of any vessel, but, on the contrary, had been employed on the Bernard as a deckhand, which according to his own statement was one who, on vessels of the type of the Bernard, acted as "mate, cook, bottle washer, and deckhand." It appears from the testimony of the

agent of the Bernard that, when the time arrived for the vessel to start from San Francisco on the voyage in question, the captain did not report for duty; that thereupon the agent told Ewald, who, as we have stated, was then employed on the Bernard as deckhand, to get a man and make the trip, and he (the agent) would make him captain when he came back; that it was late in the evening, and the wind was blowing, and he wanted to get the vessel away from the wharf. In the light of all of the testimony on the subject, we are not impressed with the claim of the libelants that the master of the Bernard was incompetent, because that was his first experience as master. The question must be considered in connection with the fact that the Bernard was a small scow schooner, carrying but two men as crew, and operating only on the Bay of San Francisco and the rivers tributary thereto. Ewald had been employed on her for two years theretofore as a deckhand. As stated by counsel for the respondents, if the libelants' claim with respect to the incompetency of Ewald were sound, then all captains would have to be adjudged incompetent on their first trip. We think the fact that it was Ewald's first trip as master is not sufficient to support a claim that the master was incompetent.

The libelants contend, further, that the incompetency of the master is shown by the fact that the schooner, when struck by a puff of wind, sheered and ran into the bank. It is stated that this was a usual and ordinary incident, and not a peril of navigation. But the evidence is that the vessel carried a mainsail, foresail, and jib, that the wind suddenly changed from the west to the northwest and that the winds are uncertain on the river. The wind filled the mainsail, and the vessel took a sheer right into the bank. Tietjan, the agent for the owner of the schooner, who had been a navigator and master of vessels of this character running on the Sacramento river, testified as follows:

"Q. With respect to a scow or these river vessels, or any sailing vessel, when they get in the river, where they are liable to get a puff of wind from among the trees, or around there, what effect does it have on them? A. You have to manage them quick; sometimes you cannot do it; there is not room enough. Q. Is not that the case with all sailing vessels, whether they are scow schooners, or ocean vessels, or anything else? A. Yes; but especially on the Sacramento river, because you have not much time there. * * * Q. Supposing the wind changes quickly, captain, can you always hold her then? A. No; that is just where it comes in; when the wind is quick, sometimes she comes back and jibes over quick."

We cannot say, in view of this uncontradicted testimony, that the evidence showed that the master was incompetent. The most that can be said is that possibly there was some undisclosed fault or error in navigation, or in the management of the vessel; but this is not established, either by the evidence or by inference, and, even if it was, it is excused under section 3 of the Harter Act. Act Feb. 13, 1893, c. 105, 27 Stat. 445 (Comp. St. 1913, § 8031).

Upon running into the bank, the schooner struck a snag under the water, which made a hole in the bow of the vessel below the water line, through which the water entered and by its weight capsized the vessel. The puff of wind was sudden and strong enough to cause the

mainsail to jibe. The jibing of the sail caused the vessel to sheer and strike the bank and encounter a snag. The snag pierced the vessel below the water line, and the water rushed into the hold of the vessel, causing the vessel to capsize. The efficient and proximate cause of the capsizing of the vessel was the snag. Had there been no snag, no injury would have resulted from the schooner running into the bank. There is no evidence of incompetency on the part of the master in the management of the vessel under these conditions. ·

With respect to the charge that the schooner was unseaworthy, because she did not answer her helm, the only substantial evidence we find upon this subject is the testimony of the master that he put the helm hard up, but she would not sheer up—she just kept on going; and, being asked, "And you think the accident really happened this time because she would not answer her helm?" he answered, "Yes." But the agent, Tietjan, testified as follows:

"Q. Did you ever see the rudder on the Bernard? A. Yes. Q. Was it large enough for her? A. Yes, sir. Q. Was it a small rudder, or a large rudder, or an average rudder? A. It was a good, large rudder for her."

The only inference to be drawn from this testimony, and the other testimony referred to, is that the reason the vessel did not answer the helm was because of the force of the wind causing the mainsail to jibe and the vessel to sheer, and not because of any unseaworthy condition arising from the size of the rudder.

With respect to the charge that the cargo was not properly stowed, it appears from the evidence that 125 sacks of beans, 5.62 tons, or approximately one-eighth of the entire cargo, were stowed in the hold of the vessel in layers or tiers three sacks high; the balance, 983 sacks, 37.18 tons, were stowed on the deck in layers or tiers five sacks high. The agent of the original respondent, and the captain, testified that in their opinion the Bernard, loaded in the manner indicated, was properly loaded for the purpose of making the trip back to San Francisco, and that the manner in which the cargo was loaded was the usual way of loading cargo of that nature. The only testimony tending to show that the cargo was improperly stowed was that of John Erickson, a witness for the libelants. He testified that as a rule scow schooners ought to carry about one-third of the cargo in the hold. But this witness also testified that:

"Some vessels are different from others. * * * Some of them carry everything on deck; some of them are built so they carry nothing in the hold. * * * They are so shallow that they put hardly anything in the hold; they carry it mostly on deck."

Admittedly the Bernard had a shallow hold—not exceeding four feet. This witness also testified that he had never been aboard the Bernard, but had simply seen her alongside the wharf.

[2] The learned judge of the court below, before whom all of the testimony was taken, with the exception of that of Ewald, found by his decision that the cargo was properly stowed. This decision, under such circumstances, is entitled to great weight, and we concur therein.

"The rule is well settled that in cases on appeal in admiralty, when the questions of fact are dependent upon conflicting evidence, the decision of the

District Judge, who had the opportunity of seeing the witnesses and judging their appearance, manner, and credibility, will not be reversed, unless it clearly appears that the decision is against the evidence." The Alijandro, 56 Fed. 621, 6 C. C. A. 54.

It follows that in our opinion the evidence fails to establish the claim of the libelants that the loss was caused either by the incompetency of the master or the incapacity of the vessel to answer her helm or the improper stowage of the cargo. We are of opinion that the respondents have shown by clear proof, leaving no reasonable doubt for controversy, that the loss was caused by a peril of navigation. This conclusion is in accordance with the requirements of the maritime law. The Mohler, 88 U. S. (21 Wall.) 230, 233, 22 L. Ed. 485; The Edwin I. Morrison, 153 U. S. 199, 14 Sup. Ct. 823, 38 L. Ed. 688; The Medea, 179 Fed. 781, 784, 103 C. C. A. 273.

The decree of the court below is affirmed.