## THE MEDEA.

(Circuit Court of Appeals, Ninth Circuit. May 26, 1910.)

No. 1,758.

1. SHIPPING (§ 132*)—LIABILITY OF VESSEL FOR DAMAGE TO CARGO—ACTIONS
—BURDEN OF PROOF.

With respect to the liability of a common carrier for loss or damage to goods, while in his possession, the question as to the burden of proof is not one of pleading but of primary liability, and where goods were received by a vessel in good condition, but delivered in a damaged condition, the ship has the burden of proof to show that the injury was due to some cause within the exceptions of the bill of lading to avoid liability although the libel may allege a specific ground of negligence.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. § 481; Dec. Dig. § 132.*]

2. SHIPPING (§ 132*)—LIABILITY OF VESSEL FOR DAMAGE TO CARGO—ACTIONS
—EVIDENCE.

The fact alone that damage to cargo was caused by sea water, without any evidence as to how the water entered the ship, is not sufficient to relieve the vessel from liability on the ground that the damage resulted from sea perils within an exception in the bill of lading, nor is it sufficient to show, in addition, that the ship encountered stormy weather on the voyage, which was no worse than should have been anticipated.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. § 484; Dec. Dig. § 132.*]

3. SHIPPING (§ 121*)—CHARTERS—"SEAWORTHINESS" AND FITNESS OF VESSEL.

A warranty of seaworthiness in a charter party is absolute and not conditional, and includes a warranty of proper stowage for the voyage.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 449, 450; Dec. Dig. § 121.*

For other definitions, see Words and Phrases, vol. 7, pp. 6362–6365; vol. 8, p. 7796.

Implied warranty of seaworthiness, see notes to The Carib Prince, 15 C. C. A. 388; Neilson v. Coal, Cement & Supply Co., 60 C. C. A. 179.]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

4. SHIPPING (§ 132*)—LIABILITY OF VESSEL FOR ·DAMAGE TO CARGO—SEA-WORTHINESS—IMPROPER STOWAGE.

     Evidence considered in a suit against a vessel for damage to cargo and *held* to establish the allegation of libelant that she was unseaworthy by reason of improper stowage.

     [Ed. Note.—For other cases, see Shipping, Cent. Dig. § 484; Dec. Dig. § 132.*]

Appeal from the District Court of the United States for the Northern District of California.

In Admiralty. Suit by Henry Lund and Henry Lund, Jr., partners as Henry Lund & Co., against the Swedish bark Medea. The Aktiebolaget Standard, claimant. Decree for respondent (173 Fed. 498), and libelants appeal. Reversed.

E. B. McClanahan and S. H. Derby, for appellants.
Nathan H. Frank, for appellee.

Before GILBERT, ROSS, and MORROW, Circuit Judges.

MORROW, Circuit Judge. On October 25, 1906, Henry Lund & Co. of San Francisco chartered the Swedish bark Medea, then being overhauled at Gothenburg, Sweden, under a charter party containing the usual warranty as to the seaworthiness of the vessel, for a voyage from the ports of Gothenburg and Limhamn in Sweden to San Francisco. The Medea sailed from Gothenburg on January 10, 1907, and from Limhamn on·January 29, 1907, taking on board a cargo at both places, and arriving at the port of San Francisco on October 12, 1907. The cargo consisted of:

| Cement | From Limhamn | 853.1791/2240 tons. |
|---|---|---|
| Iron | From Gothenburg | 343.2220/2240 " |
| Bottles | From Gothenburg | 175. 168/2240 " |
| Clay | From Limhamn | 23. 487/2240 " |
| Sardines | From Gothenburg | 13.1303/2240 " |
| Chalk | From Limhamn | 8.1370/2240 " |
| Sand | From Limhamn | 8. 400/2240 " |

     ·Total cargo........................1426.1019/2240 tons.

On arrival of the bark at San Francisco, it was found that much of the cargo had been damaged by salt water, and thereupon Henry Lund & Co. brought this action against the ship to recover the loss. It was alleged in the libel that the cargo was received on board of the vessel at the ports named in good order, well conditioned, and free from damage; that upon examination and special survey at the port of San Francisco the cargo was found to have been greatly injured and damaged during the voyage; that the damage and the injury resulted from the unseaworthiness of the vessel. The libel was verified by one of the libelants upon his knowledge that the cargo was received in a damaged condition and upon information and belief as to the cause of the damage. The respondent excepted to the libel on the ground that it could not be ascertained therefrom whether the damage arose from the alleged unseaworthiness of the vessel or from bad stowage of the cargo; or in what respect the vessel was unseaworthy, or in what respect the stowage was bad. The exceptions were overruled by the court and thereupon respondent filed its answer. In its answer to

the libel the respondent, referring to the allegation that the cargo had been received on board the vessel in good order and condition, alleged that it was ignorant so that it could neither admit nor deny the same, and called for proof. The same answer was made as to the other allegations of the libel, with the further allegation that on information and belief it denied the unseaworthiness of the vessel and the bad stowage of the cargo, and alleged that the damage to the cargo, if any, was caused by the peril of the sea. The answer was verified by one of the proctors for the respondents upon information and belief.

The first question relates to the burden of proof. The libel alleges the shipment of the goods constituting the cargo in good order and condition, and that the cargo was delivered in a damaged condition. Do the allegations of the libel that the damage to the cargo resulted from the unseaworthiness of the vessel or from improper and bad stowage of the cargo place the burden of proof on the libelants? The respondent contends that they do and cites the case of Rich v. Lambert, 53 U. S. 347, 353, 13 L. Ed. 1017, as authority for his contention. In that case the essential allegation of the libel was "that the said goods, wares, and merchandise were not taken care of and safely carried and delivered according to the tenor and effect of the bills of lading; but, on the contrary, although no damage accrued from any dangers or accidents of the seas, or navigation, the said goods were so badly taken care of by the said master, and the cargo of said ship, and particularly a quantity of salt on board thereof was stowed so improperly, that through the neglect and mismanagement of the master the said goods were greatly damaged and great loss thereby sustained." The respondents in their answer in that case alleged "that the ship encountered several violent gales, and very boisterous weather during her voyage, causing her to labor heavily, and straining her badly, the sea at times breaking over her, so that she shipped a great deal of water from leaks, and stress of weather, requiring the constant use of pumps, which were faithfully attended to, and every effort made to preserve the ship and save the cargo from damage." In passing upon the issue thus presented the court said:

"We have already stated that the libelants charge in the several libels the damage to the goods to have been occasioned exclusively from the improper stowage of the cargo, and especially of the sacks of salt in the between-decks over the goods in the hold of the vessel. This is denied in the answers, and as the recovery must be had, if at all, according to the allegations in the pleadings, it is incumbent on the part of the libelants to maintain this ground by the proofs, in order to charge the respondents."

This appears to have been said with respect to certain testimony, and the well-known rule requiring that the proofs of each party must substantially correspond to his allegation so far as to prevent surprise. It had no reference to the burden of proof which is clearly stated in a subsequent paragraph of the opinion as follows:

"The goods having been found to be damaged on the arrival of the ship, and which must necessarily have accrued in the course of the voyage, the burden devolved upon the respondents to show, in order to excuse themselves, that it was occasioned by one of the perils of navigation within the exception in the bill of lading. That burden they have assumed; and have shown by nearly an unbroken current of testimony, that the conveyance of the salt between decks, in a mixed cargo, was according to the established custom and

usage of the trade between Liverpool and this country, and that it was well stowed, and packed, and secured with proper and sufficient dunnage."

The opinion in this case was written by Mr. Justice Nelson, who wrote the opinion of the court in New Jersey Steam Navigation Co. v. Merchants' Bank, 47 U. S. 347, 382 (12 L. Ed. 465), where the court said:

"The burden of proof lies on the carrier, and nothing short of an express stipulation by parol or in writing should be permitted to discharge him from duties the law has annexed to his employment. The exemption from these duties should not depend upon implication or inference, founded on doubtful and conflicting evidence, but should be specific and certain, leaving no room for controversy between the parties."

Mr. Justice Nelson also wrote the opinion of the court in Clark v. Barnwell, 53 U. S. 272, 279 (13 L. Ed. 985), where the court said:

"After the damage to the goods; therefore, has been established, the burden lies upon the respondents to show, that it was occasioned by one of the perils from which they were exempted by the bill of lading."

The case of McKinlay v. Morrish, 63 U. S. 343, 16 L. Ed. 100, is cited by the respondent as holding that the burden of proof is where the pleadings place it. In that case the liability of the carrier for damage to a shipment of soap was alleged to have been caused by bad stowage and leaks in the deck of the vessel. The respondents met the charge by direct denial, averring that if the soap had been in any way injured, it might have been from causes beyond his control by any care whatever, and should be attributed to causes or perils excepted to as they were expressed in the bill of lading, viz., "all and every danger and accident of the seas and navigation of whatsoever nature." It appears that there was testimony received by the trial court concerning storms encountered by the vessel in the Bay of Biscay and in weathering Cape Horn. But the case in the Supreme Court was put by the libelants altogether upon bad stowage and the leaks in the deck as both had been alleged in the libel. What that court said about the exclusion of testimony inapplicable to the issues made by the pleadings states the rules referred to in Rich v. Lambert, supra, that the proof must correspond to the allegation, and had no reference whatever to the burden of proof. But even this rule of pleading and proof is no longer enforced in admiralty with the strictness observed in common-law procedure. In the Gazelle and Cargo, 128 U. S. 474, 487, 9 Sup. Ct. 139, 142 (32 L. Ed. 496), the court, referring to this rule, said:

"In the courts of admiralty of the United States, although the proofs of each party must substantially correspond to his allegations, so far as to prevent surprise, yet there are no technical rules of variance, or of departure in pleading, as at common law; and if a libelant propounds with distinctness the substantive facts upon which he relies, and prays, either specially or generally, for appropriate relief (even if there is some inaccuracy in his statement of subordinate facts, or of the legal effect of the facts propounded), the court may award any relief which the law applicable to the case warrants."

The rule as to the burden of proof as stated in New Jersey Steam Navigation Co. v. Merchants' Bank, supra, and in Clark v. Barnwell, supra, has been followed by the courts of the United States in numerous cases, and must be deemed to be settled.

In Nelson v. Woodruff, 66 U. S. 156, 169 (17 L. Ed. 97), the court said:

"When goods in the custody of a common carrier are lost or damaged, the presumption of law is that it was occasioned by his default, and the burden is upon him to prove that it arose from a cause for which he is not responsible."

In Transportation Co. v. Downer, 78 U. S. 129, 133 (20 L. Ed. 160), the court said:

"On the trial the plaintiff made out a prima facie case by producing the bill of lading, showing the receipt of the coffee by the company at New York, and the contract for its transportation to Chicago, and by proving the arrival of the coffee at the latter place in the propeller Brooklyn in a ruined condition, and the consequent damages sustained. The company met this prima facie case by showing that the loss was occasioned by one of the dangers of lake navigation."

In the case of The Mohler, 88 U. S. 230, 233 (22 L. Ed. 485), a cargo of wheat had been shipped on a barge appurtenant to the steamer Mohler at Mankato, on the Minnesota river, destined for St. Paul on the Mississippi. The bill of lading contained the usual exemption of the "damages of navigation." The barge was wrecked by collision with one of the piers of a bridge just above the city of St. Paul and was totally lost. The answer set up that the accident occurred through the sudden and unexpected gust of wind which overtook the boat as she passed through the piers, and that, therefore, she was unanswerable for the collision. The case was heard on the testimony introduced by the respondents, the libelants having called no witnesses. The Supreme Court held that:

"The burden of proof lies on the carrier, and nothing short of clear proof, leaving no reasonable doubt for controversy, should be permitted to discharge him from duties which the law has annexed to his employment."

In The Edwin I. Morrison, 153 U. S. 199, 14 Sup. Ct. 823, 38 L. Ed. 688, the court, after referring to the carrier in that case, said:

"In any aspect, the real point in controversy is, did the respondents so far sustain the burden of proof which was upon them?"

In the case of The Majestic, 166 U. S. 375, 386, 17 Sup. Ct. 597, 41 L. Ed. 1039, the libelants were passengers on board the Majestic from Liverpool to New York. On landing in New York the contents of their trunks was found badly damaged by sea water. It was charged in the libel that the damage to the baggage was caused by negligence and want of proper care. The answer admitted the delivery of the baggage on board in good order and its condition on arrival in New York, but put in issue the allegations of negligence and want of proper care. It set up certain stipulations contained in the ticket under which libelants took passage, by which it was averred that the ship was discharged of liability, or in any case was not liable for any injury beyond the amount of £10. It was further alleged that the injury, if any, was caused by the act of God or the perils of the sea, and was in no wise caused by the neglect or misconduct of its agents or any of its servants. The defense that the ship was discharged of liability by reason of the stipulations contained in the ticket was dis-

allowed. The remaining question upon the allegations of the libel, if the burden of proof was upon the libelants, was whether the damage to the baggage was caused by negligence or want of proper care; but upon the allegations of the answer, if the burden of proof was upon the carrier, the question was whether the damage was caused by the act of God or the perils of the sea. The Supreme Court held that the question to be determined was the latter with respect to which the burden was upon the carrier.

The reason why the burden of proof is placed upon the carrier is that he or his servants know, or at least ought to know, the circumstances connected with the loss or damage to the cargo, while the owner of the lost or damaged goods has no such knowledge, and if he were required to furnish such proof it would operate as a denial of justice. Riley v. Horn, 5 Bing. 217; Berry v. Cooper, 28 Ga. 543; Mitchell v. Railway Co., 124 N. C. 236, 32 S. E. 671, 44 L. R. A. 515. In Selma, Rome, etc., Railroad v. United States, 139 U. S. 560, 567, 11 Sup. Ct. 638, 640 (35 L. Ed. 266), the Supreme Court followed this rule saying:

"While the general rule is that the burden of proof is where the pleadings place it, namely, upon the party against whom judgment must go, if no evidence whatever is introduced, its application is often affected by circumstances. 'From the very nature of the question in dispute,' says Mr. Best, 'all, or nearly all, the evidence that could be adduced respecting it must be in the possession of, or be easily attainable by, one of the contending parties, who accordingly could at once put an end to litigation by producing that evidence; while requiring his adversary to establish his case, because the affirmative lay on him, or because there was a presumption of law against him, would, if not amounting to injustice, at least be productive of expense and delay. In order to prevent this, it has been established, as a general rule of evidence, that the burden of proof lies on the person who wishes to support his case by a particular fact which lies more peculiarly within his knowledge, or of which he is supposed to be cognizant.' Best on Evidence, § 274."

These cases settle the rule beyond controversy that with respect to the liability of a common carrier for loss or damage to goods while in his possession the question as to the burden of proof is not one of pleading, but of primary liability which the carrier must meet according to the tenor of his contract.

The contract of the carrier in this case was that of an insurer requiring that he should deliver the cargo in like good order and condition as when received with certain stipulated exceptions including, among others, dangers and accidents of the seas and of navigation described in the charter party as perils of the sea. If perils of the sea were encountered by the Medea on her voyage the evidence of that fact was in the possession of the officers of the vessel, and if the respondent relied upon that fact as one of the stipulated exceptions to liability provided in the contract, it was required under the rule to produce that evidence. Upon the trial the libelants introduced in evidence the charter party under which the libelants chartered the Medea for the purpose of transporting the cargo mentioned in the libel from Gothenburg and Limhamn in Sweden to the port of San Francisco; also bills of lading and testimony showing that the cargo was received on board at the ports of shipment in good order and condition, and was delivered in San Francisco in a damaged condition.

The libelants also introduced testimony tending to show that the damage to the cargo was primarily caused by improper stowage of the cargo causing the seams of the deck to open and let down the salt water upon the cargo.

The respondent to show that the damage to the cargo was caused by perils of the sea introduced the testimony of the master of the vessel, Carl H. Bruse, and that of the chief mate, R. S. Royter, also the Marine Declaration or Extended Protest of the Master. From this testimony it appears that the Medea sailed from Gothenburg on January 10, 1907, and from Limhamn on January 29, 1907, taking on a cargo at both places. After completing the cargo the vessel sailed for San Francisco. The master testified in substance that it was the original intention to sail down through the English Channel, but, as stormy weather was coming up from the south, the course of the vessel was laid around the north of Scotland where stormy weather was also encountered. Coming in sight of Shetland Islands they had to keep clear of the land, and so tacked the other way to get enough water between the vessel and the land so as not to go ashore. During that time some sails were damaged and lost. The lower topsail on the foremast was lost altogether. The lantern boxes over the forecastle were washed away. A chain plate was broken, and the new rigging became slack. The sea was very high; more than a common gale of wind, and more or less water was taken on deck. In consequence of this heavy weather, and after the vessel had been out three weeks, the men and mates were called together, and it was agreed to get to the nearest harbor, set the rigging, and get things in order. They accordingly made for Christiansand in Norway, encountering storms on the way; but they finally reached port and examined the cargo. The hatches were raised, but nothing was found damaged. Afterwards the cargo was taken from one side to the other to raise her port above the water line. The port was opened, and was found to have been leaking, but not so much as to get any water marks for the pumps. Both ports had been packed at Gothenburg under the supervision of, the surveyors. When it was found that one of the ports had sprung a leak, it was repacked and closed. The repairs were made in a week, but on account of the weather they remained in port for two weeks. They again set sail on the same course as before. It was about a month before they came to the west coast of Scotland. The distance from Christiansand to the western coast of Scotland is less than 500 miles. The wind was always ahead and stormy so that the vessel could carry but very little sail. The sea was heavy, and they got water on deck, lost a post, and got much water in the cabin; but the water did not come further than the cabin. After they got to the west coast of Scotland the course lay southwest towards the Cape. On the Atlantic running from Staten Island down to Cape Horn the weather was more moderate, and they got more favorable winds, until they came to the northeast trade winds. After they passed the line and going through the southeast trade winds they encountered a heavy storm one day. It carried away the foretopmast stay, and the foretopmast staysail was blown away at the same time, and a chain broke from the jib boom. Then they had more or less fresh wind until they

came as far as the Patagonian coast. They got heavy weather again, but the wind was not from the head. It was in favor of the vessel. They then came in sight of Staten Island. From that time they got very bad weather, not every day, but it was the worst that they got around the Horn for about a month or five weeks. Sometimes they could not carry canvas except a little piece of lower maintopsail; and the sea broke very high, and there was a lot of water on the deck and in the cabin. Sometimes they had heavy weather for a day or more, and were driven back, and could not carry canvas. The current was against the vessel in going that way during the five weeks, including the month of July they were rounding the Horn. At that time some of the bulwarks were broken and carried away, two chain plates and two of the shrouds were broken, and a stanchion was broken. In the five weeks rounding the Horn they made a distance of about 200 miles. Had bad weather for two or three weeks after rounding the Horn. The master thinks he sailed from Limhamn on the 31st of January and arrived in San Francisco on the 12th of October. The master testified that when the ship rolled she came back again as ships do in heavy weather; not very quick, and that the ship was one of the most tender ships.

The vessel carried a cargo of about 1,426 tons. Of this cargo approximately 300 tons were stowed in the between-decks. In the storm encountered going around Scotland the vessel drew a little water; it was not very often that they pumped, but only sounded. The vessel has a very sharp build so that a very little water would take in the pumps very quickly. It would not take as much water to reach the pumps as in a flat ship. This was the first trip the master had made in an iron ship. He had been chief mate on a vessel about the same size as the Medea having two decks, but was never in command of any but a single deck ship. Prior to his appointment as master he did not know anything about the Medea. When loading at Gothenburg it was to be expected that she would meet storms and gales, and the master expected bad weather. The season was the season for storms in the North Sea, and he expected storms around the Horn, and in the stowage of the cargo he had in mind the voyage they were going to take. The sudden rolling of the ship depends upon her size, but the more weight there is on the bottom, the more stiff the vessel will be. A vessel is stiffened by putting the weight down low, which makes her roll more in a seaway. He testified that with the cargo in this case the right proportion for the between-deck load was 300 tons. That would make her a stable ship. When the cargo was examined at Christiansand there was no damage to it. After they had passed the line coming north after having rounded the Horn the hatches were taken off. On the way south around the Horn they did not take the main hatches off, but they got the fore hatches off and looked after them. They did not find any damage to the cargo then. Under cross-examination the master was asked the following questions:

"Q. Do you think the damage to the cargo occurred in the Pacific Ocean? A. From Staten Island around the Horn to the Pacific. Q. Did you examine the deck underneath at any time on the voyage? * * * A. I was not down

there myself, but the mate was down and looked after it. Q. The mate was down? A. Yes, sir. Q. And he did not report to you that there was any leakage through the deck? A. No, sir. Q. To what do you attribute this damage to the cargo? A. I cannot explain it in any other way than owing to the excessive storms that we had the water in some way had gotten down into the cargo. Q. The sea water? A. Yes, sir, the sea water. It cannot be any other water. Q. Yet your mate when he examined the hold did not report to you that there was any leakage through the deck? A. No, sir. Have you any idea where this water came from that got into the hold? A. No, sir. Q. You do not know where it came from? A. No, sir."

The testimony of the chief mate concerning the voyage after leaving Christiansand is in substance as follows, his memory being refreshed by the logbook, from which he read:

On Friday, March 8th, we were at Christiansand. March 9th we left the harbor at Christiansand to go on the voyage again. When we got outside we found fine weather. It commenced with a little blow and squalls, and we made fast the small sails as there was more breeze; not a storm exactly. On March 15th the weather was stormy and rainy. On March 17th sometimes there was a squall; it blowed a little; sometimes no wind at all. In the forenoon of March 18th there was no wind; in the afternoon storm with squalls. At four o'clock in the morning of the 19th it was snow and storm. The topsail sheets broke, and the sail was blown to pieces on one side. On the 21st there was a storm and some pieces aft that go round the stern washed away. On the 22d the sea was heavy; ship worked hard. Much water on deck. We were at this time north of Scotland. We had a storm on the 31st of March. Up until the 7th of April according to the logbook we had storms most of the time. On May 19th we had a hard storm. We lost three or four or five sails; and we had plenty of water on deck and water in the cabin. On the 4th of June it was a storm; and some sail was blown to pieces. The sea was heavy and the ship worked hard. This was when we began to get in the neighborhood of Cape Horn. The weather varied from the 17th of June from moderate to heavy with squalls. On the 23d the ventilator in the forecastle head was broken by a heavy sea; also one stanchion, and the skylight in the forecastle head. On Tuesday, June 25th, we sighted Staten Island. The weather was stormy with short squalls. On the 26th the storm was not so heavy. On the 25th, 26th, and 27th there were storms and parts of the rigging were lost. From the 28th of June until the 7th of August they encountered storms and heavy sea and lost various parts of the rigging. The witness testified in general that during the trip around the Horn they encountered many heavy storms and heavy sea; and always plenty of water on deck. When we got a head storm we were always driven back and could not keep our course. During the heavy weather we had in the North Sea and north of Scotland and around the Horn the ship rolled easily; and she did not roll very fast. The ship is very sharp and tender.

Under cross-examination this witness was asked if he had encountered storms before in his experience. He said he had many times, and related an experience he had in the Bay of Biscay on his first voyage, and at another time when the ship he was on had been out a day

from Savannah and encountered a hurricane, and the vessel was close to going to the bottom. He was then asked:

"Q. Can you remember another storm, a very severe storm? A. Them two were the worst. I have been out in a thousand others. Q. A thousand other storms? A. Yes, sir. Q. Can you remember any particular one that was especially severe? A. I cannot remember. Q. They are all of them—this thousand or more—something similar that you met going around the Horn in the Medea? A. Yes, sir; just storms. Q. Storms that a sailor expects to meet when he goes to sea? A. Yes, sir, of course. Q. When you went on this trip through the North Sea it was a stormy season? A. Yes, sir; winter time; that is the stormiest time. Q. You expected storms in the North Sea? A. Yes, sir. Q. When you went around the Horn you passed there in a stormy season? A. Yes, sir. Q. You expected storms? A. Yes, sir. Q. And you were not disappointed? You got them? A. Yes; we got storms. * * * Q. Then you had no water in the hold after you left Christiansand? A. Sometimes we must use pumps, anyhow. The ship was leaking a little, but where it came from I don't know. Standing eight or ten days we had to pump two or three minutes. Q. Was this pumping done after the storms? A. No, sir; when there is a little water in the ship there is no use to pump. When a ship is laying quite steady we pump out all the water that is in her and then we let her stand for eight or ten days again. Q. You did use the pumps on the voyage around the Horn? A. Yes, sir; once in a while. * * * Q. So that after leaving Christiansand, and after you had at that port fixed that side port, you know of no way for the water to have got down into the hold? Everything was tight? A. Yes, sir. Q. It could not have come down through the hatches? A. No, sir. Q. Nor through the decks? A. No, sir. Q. Nor through this exposed piece on the starboard stern? A. No, sir. Q. And the damage which you did see to the cargo when you went down on one occasion was such as to show itself to the eye? * * * A. Yes. sir; there was damage on that cargo. Whether it came from the top I don't know. Q. And you at no time noticed any water in the cargo? A. Towards the end of the voyage there was some water came down forward. I did not go far aft because my legs were poor. Q. When was this water noticed coming down onto the cargo forward? What date? A. I don't know. Q. Have you a note of it in your log? A. I did not put it in there. Q. How did you know it came down on the cargo forward? A. You could see it. Q. Did you see it? A. A little forward. Q. When was it that you saw water coming down on the cargo forward? A. I cannot tell that; I don't remember. Q. You did see it? A. Yes, sir. Q. Where was it coming from? A. Coming from the top a little from the deck, from the sweat, or something like that. Q. You saw water coming? A. No, sir; I say the cargo was a little damp. I saw no water running down only that the cargo was damp. * * * Q. By the term 'working of the ship' which you have used on your direct examination, what do you mean? A. I don't think she worked any harder than other ships do."

The Marine Declaration or Extended Protest of the Master furnishes no additional detail to that furnished by the testimony of the master and mate.

If we accept the testimony of the master who should have known when and where the damage to the cargo occurred, we must conclude that the cargo had not been damaged when the Medea sailed from Christiansand, nor had it been damaged prior to reaching Staten Island, an island off the southeastern extremity of Tierra del Fuego. When the master was asked the question: "So that you think the damage to the cargo occurred in the Pacific Ocean," his answer was, "From Staten Island and around the Horn to the Pacific." When asked to what he attributed the damage of the cargo to, his answer was that he could not explain it in any other way than owing to the excessive storms they had and the water in some way had gotten down

into the cargo. He says it was the sea water; it could not have been any other water. When asked if he had any idea where this water came from that got into the hold, he answered, "No, sir." The mate who kept the logbook in which he was required to make a faithful and minute journal of the voyage (Curtis, Rights and Duties of Merchant Seamen, 95) was not able to furnish any more definite information than the master concerning the cause of the damage to the cargo. He testified that the water could not have come down through the hatches nor through the deck, and whether it came from the top he did not know. He says that towards the end of the voyage there was some water coming down forward. When this water was noticed he did not know. He made no note of it in the log.

The master and mate did not even agree upon these meager details relating to the time and cause of the damage to the cargo. Storms were encountered and water came on deck as was expected, but they did not connect either the storms or the water on deck with the water that damaged the cargo. Where the water came from that damaged the cargo they did not know. The testimony leaves the question in doubt. The evidence is not sufficient to sustain the burden of proof cast upon the carrier.

In the recent case of The Folmina, 212 U. S. 354, 362, 29 Sup. Ct. 363, 365 (53 L. Ed. 546), the Supreme Court said:

"Where showing an injury by sea water does not in and of itself operate to bring the damage within the exception against dangers and accidents of the sea, it follows that it is the duty of the carrier to sustain the burden of proof by showing a connection between damage by the sea water and the exception against sea perils."

The court further said:

"The inability of the court below to determine the course of the entrance of the sea water would imply that the evidence did not disclose in any manner how the sea water came into the ship. In other words, while there was a certainty from the proof of a damage by sea water, there was a failure of the proof to determine whether the presence of the sea water in the ship was occasioned by an accident of the sea, by negligence, or by any other cause. Manifestly, however, the presence of the sea water must have resulted from some cause, and it would be mere conjecture to assume simply from the fact that damage was done by sea water that therefore it was occasioned by a peril of the sea. As the burden of showing that the damage arose from one of the excepted causes was upon the carrier, and the evidence, although establishing the damage, left its efficient cause wholly unascertained, it follows that the doubt as to the cause of the entrance of the sea water must be resolved against the carrier."

The court refers to a number of cases "holding that because the damage to cargo was shown to have been occasioned by sea water without any satisfactory proof as to the cause of its presence, in view of the burden resting upon the carrier, conjecture would not be permitted to take the place of proof." Among other cases the court refers to the case of The Compta. 4 Sawy. 375, Fed. Cas. No. 3,069. The action in that case was to recover for damage to goods shipped on board a vessel and the defense was that the vessel during the voyage encountered sudden and violent gales and heavy seas so as to strain and damage her thereby causing her decks to leak and admit water

to her cargo. In proof of these allegations the respondents produced the logbook and protest of the master, supported by the suppletory oaths of the latter and the two mates. The logbook showed that the ship experienced weather of a considerable severity. Speaking of this evidence the court said that the "decks appear to have been very frequently flooded, and 'high, confused seas, heavy seas, heavy swells,' are constantly mentioned. * * * But that is not of such unusual and extreme severity as to justify the assumption, without further evidence, that it caused the leaks which occasioned the damage. The carrier, to make good his defense, is bound to show that the damage arose from a sea peril. It is not enough for him to show that it might have arisen from that cause. He must prove that it did."

In the present case the burden of showing the connection between the damage by sea water and the exception against sea perils has not been discharged by the carrier. The cause of the damage to the cargo has been left to conjecture and we must look elsewhere for a satisfactory explanation. But libelants have not relied entirely upon the inability of the respondent to prove that the damage to the cargo arose from perils of the sea. They have introduced evidence tending to prove that the damage was caused by bad stowage. We will now proceed to consider that question.

The total weight of the Medea's cargo was 1426.1019/2240 tons. Upon the proper distribution of this cargo in the vessel depends the question of stowage. The vessel was warranted "tight, staunch, strong and in every way fitted for the voyage." If she was badly stowed at the beginning of the voyage she was not fitted for the voyage. The warranty of seaworthiness was absolute and not conditional. The shipowner's undertaking is not merely that he will do and has done his best to make the ship fit, but that the ship is really fit to undergo the perils of the sea and other incidental risks to which she must be exposed in the course of the voyage. The Edwin I. Morrison, 153 U. S. 199, 210, 14 Sup. Ct. 823, 38 L. Ed. 688; The Caledonia, 157 U. S. 124, 131, 15 Sup. Ct. 537, 39 L. Ed. 644; Corsar v. J. D. Spreckels & Bros. Co., 141 Fed. 260, 264, 72 C. C. A. 378. The vessel was loaded by the master—that is to say, the cargo was stowed under his direction—and the distribution was made in accordance with his experience. He was 56 years of age and had been going to sea 40 years. He had been 10 or 11 years mate and 19 years a master; but this was his first voyage on the Medea. Prior to this voyage he knew nothing about the Medea. This was his first command of an iron ship and his first command of a two-deck ship. His experience with a vessel of the size of the Medea consisted in being chief mate on one vessel of about the same size. With this experience he thought that the right proportion of the cargo of the Medea for the between-deck load was 300 tons.

The libelants introduced in evidence the testimony of Charles Green, a master mariner, who was 54 years of age, and who had been 8 years an officer or mate, and 17 years a master of a vessel. He had been master of the Medea for seven years from 1889 to 1896, and had frequently loaded her with a dead weight cargo. He had always given instruction to the stevedores when loading to have about one-third

of the dead weight in the between-decks. The approximate weight in tons carried by the Medea on such occasions in between-decks was usually from 450 to 500 tons. On one occasion he had 350 tons stowed between-decks and when he got to sea, he noticed the jerky motion when the ship rolled to windward and the tendency to ship heavier water than he had noticed on the previous voyage when with a cargo of 1,500 tons nearly 500 tons were stowed between-decks. Whilst hove to on the port tack a heavier lurch than usual caused the main topgallant backstays to carry away, and the mast went over the side. As the rigging and backstays were all good, he attributed the loss of the mast to the general unseaworthiness of the ship, to the excessive weight in the lower hold, and the center of gravity being too low. When the weather moderated he at once took up 60 or 80 tons of the cargo out of the hold into the between-decks and in about three weeks buffeting against heavy gales and high seas off Cape Horn he found she behaved well, and went through it all without accident. He refers to other experiences with the vessel from which he concluded that for stability the vessel required one-third of her cargo between-decks. During voyages when her cargo was thus distributed she never had a pound of damaged cargo. This witness knew the individual characteristics of the Medea and his testimony is entitled to weight for that reason.

Samuel Vint, a master of more than 17 years' experience, who had been around the Horn about 30 times, and had had 27 years' experience in the stowage of cargo on vessels, testified that he was then in command of the Killiecrankie, an iron ship which had come around the Horn from Gothenburg and Alberg with a cargo of iron and cement. His experience had taught him to put about one-third of his cargo between-decks. He had two-fifths of his cargo on the Killiecrankie stored between-decks, and no part of the cargo was damaged during the voyage. He knew the Medea, and in answer to a hypothetical question stated that one-third of the cargo should have been loaded between-decks, and that loaded as she was the roll of the Medea would be accompanied by a sudden return movement.

The libelants introduced the testimony of other experienced masters who testified that the vessel should have carried one-third of her cargo between-decks, and when informed as to the cargo carried they testified in answer to fair hypothetical questions that the cargo was improperly stowed.

The testimony as to how the weight of the cargo was distributed is conflicting. The respondent introduced the depositions of the stevedores at Limhamn, and a stipulation as to the testimony of the stevedores at Gothenburg who loaded the vessel and who testified, or would have testified, as to the weights of the various articles constituting the cargo stowed between-decks, from which it appears that the weight of the between-deck cargo as estimated by these witnesses was 343 tons. If this testimony were accepted as true the between-deck cargo was still insufficient to give the vessel stability according to the actual experience of Capt. Green, the former master of the vessel, and other masters who testified concerning the proper loading of such a vessel. But the evidence on the part of the libelants tends to

show that the weight of the between-deck cargo based upon the cus-
tom-house weights taken in San Francisco did not exceed 266 tons,
or 18 per cent. of the whole cargo; and whether we take the testimony
of the libelants that only 266 tons were stowed between-decks, or the
testimony on the part of the respondent that the between-decks cargo
was 343 tons, it is clear that the stowage of the cargo was bad, caus-
ing the ship to strain in heavy weather and open her deck seams, and
that the damage caused by the leakage of salt water through the seams
of the deck down onto the cargo is to be attributed to the improper
distribution and bad stowage of the cargo.

It follows that because of the failure of the respondent to sustain
the burden of proof the cause of the damage to the cargo arose from
perils of the sea, and, the weight of evidence being in favor of the
libelants that the vessel was unseaworthy by reason of the bad stow-
age of the cargo, the decree should have been in favor of the libel-
ants.

The decree of the District Court is therefore reversed, with instruc-
tions to ascertain the damages sustained by the libelants, and award
a decree accordingly.