## THE BABIN CHEVAYE.

(Circuit Court of Appeals, Ninth Circuit. November 3, 1913.)

### No. 2,185.

1. SHIPPING (§ 132*)—DAMAGE TO CARGO—LIABILITY OF VESSEL.

Under a charter party, stipulating that the vessel is tight, staunch, strong, and in every way seaworthy and fitted for the voyage, but exempting the owner from liability for loss or damage to cargo through perils of the sea, etc., the obligation of the owner is to furnish a vessel which satisfies such requirements to a reasonable degree, and not merely to exercise due diligence to do so; and, where it is shown that the cargo was damaged by the entrance of sea water into the ship during the voyage, the burden is cast upon him to avoid liability to prove, not only seaworthiness, but that the damage was attributable to perils of the sea, or otherwise within the exceptions.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 471–487; Dec. Dig. § 132.*]

2. SHIPPING (§ 132*)—DAMAGE TO CARGO—LIABILITY OF VESSEL—PERILS OF THE SEA.

Damage to cargo from sea water on a voyage from Antwerp to Portland, Or., *held* not due to the unseaworthiness of the vessel, by reason of improper stowage or defective construction or caulking of the decks, but to perils of the sea within the exception in the charter party, it being shown that the vessel encountered unusually stormy weather, not ordinarily to be anticipated, lasting several days, during which she was severely strained and injured, seamen were injured, and others washed overboard and lost, and water entered through the little hatchway into the sailroom, and from there into the cargo.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 471–487; Dec. Dig. § 132.*

Loss by perils of the sea, see notes to The Dunbritton, 19 C. C. A. 465; Southerland-Innes Co. v. Thynas, 64 C. C. A. 118.]

Appeal from the District Court of the United States for the District of Oregon; Robert S. Bean, Judge.

Suit in admiralty by George H. C. Meyer, H. L. E. Meyer, Jr., J. W. Wilson, and John M. Quaile, partners as Meyer, Wilson & Co., against the barque Babin Chevaye; Bureau Frères & Bailergeau, claimants. Decree for claimants, and libelants appeal. Affirmed.

Wood, Montague & Hunt, of Portland, Or., for appellants.

Snow & McCamant, of Portland, Or., for appellees.

Before GILBERT and MORROW, Circuit Judges, and WOLVERTON, District Judge.

WOLVERTON, District Judge. This is a libel to recover damages to cargo sustained at sea while in transit upon the French barque Babin Chevaye from Antwerp, Belgium, to Portland, Or. The cause of damage relied upon is unseaworthiness of the ship at the time of entering upon her voyage in three particulars: Improper stowage, insufficient caulking of the main deck, and structural deficiency, in that two small hatches pierced the main deck, which could not be and were not battened down. The District Court found against libelants, and they appeal.

Some question is made relative to the sufficiency of the libel as to

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

whether it definitely sets forth all these causes of injury to the cargo, and especially the latter. An amended libel was filed, and it is objected that this is irregularly in the record. However this may be, we will waive all such objections, and pass at once to an investigation of all the alleged causes of injury now insisted upon.

The Babin Chevaye is an iron ship built in 1901. She set sail from Antwerp February 16, 1909, by way of Cape of Good Hope, and arrived at Portland August 23d. The cargo consisted of steel, pig iron, cement, coke, coal, talcum, ocher, Venetian red, and other commodities, water and provisions, aggregating about 2,974 tons, which was stowed about 954 to 960 tons between decks and 2,020 tons in the lower hold. The captain of the ship, who was an experienced mariner, kept watch of the manner of stowage while the vessel was taking on cargo, and he considered that she was well loaded, "and that the weights were properly distributed, so not all the heavy cargo was in one point."

R. R. Baines, a marine surveyor of many years' experience in loading vessels, and especially ships of the type of the Babin Chevaye, supervised the loading of the cargo in question. He enters into much detail touching the manner in which the loading was done, indicating that great care was observed concerning it, and manifestly it was his earnest endeavor to take care that it was done properly.

M. A. F. Rehel, the first mate, also supervised the stowage, and gave evidence respecting the particularity with which the work was done, and attests the proper distribution of the cargo.

Now, against this testimony is that of Captain Hoben and Mr. Tucker. The former says:

"As far as I seen, the cargo, in my opinion, was properly stowed, but I wouldn't consider from my knowledge of this ship in general, and the appearance of the ship, and the working of the ship, and what I have seen of the ship that the cargo was properly distributed."

He then gives his reasons for the opinion. And Tucker says:

"I was of the firm opinion there was not sufficient cargo stowed in the between decks."

These witnesses live in Portland and saw the vessel only after her arrival at destination. As corroboration of improper stowage is the fact, which is admitted by the officers of the ship, that she labored and strained greatly while in heavy seas. Albert Crowe, a seaman of long experience, was of the opinion that a variance of from 50 to 75 tons distribution as between-decks and the lower hold would make no particular difference in the action of the ship while in navigation.

Without further detail of the testimony we are clear as we view its effect that improper stowage and distribution of cargo was not a fault contributing to the damages complained of.

Let us next inquire: Was the Babin Chevaye otherwise seaworthy?

Captain Lebeaupin declares that the ship when she left Antwerp was staunch, strong, and seaworthy. This is a conclusion of fact, and it must be determined whether the evidence supports it. Lebeaupin further testifies that the vessel was examined by a surveyor of the Bureau Veritas and two deep-sea captains and himself. She was put in dry dock, and all rivets gone over to see if they needed repair, and thor-

oughly cleansed and painted with two coats on the outside. Her deck was examined, and so of her anchors and anchor chains. Her stanchions were all found to be in good condition, except one which required new rivets. These were supplied, and were in good condition when she sailed; Lebeaupin giving careful personal attention to all these matters. The witness further asserts that he went all over the ship while she was in dry dock, examined the deck and seams with his knife, went abaft and examined the rigging, and directed a repair of one of the masts, which was complied with, and that when the ship sailed everything had been found in good condition, and had been repaired as ordered by the different surveyors. Her deck was in good condition, practically water tight, her poop deck the same, and her hatches were thoroughly secured. On cross-examination the captain says:

"I went together—was accompanied by my first mate, and we went over the entire deck from fore to aft; we went over all the seams, and if there was a seam that appeared doubtful, I made an incision with my knife to find if the oakum was in good condition, or needed repairing, and if there was a soft place, I went down in the hold to see if there was a leak."

Emile Garnuchot, an inspector of the Bureau Veritas, testifies that he made examination of the Babin Chevaye for classification, afloat and in dry dock, in January before sailing, and that certain things were done under his direction, among others, she was dry docked and cleaned and given two coats of paint; her tenth frame from the after bulkhead, which had been broken in three places, was repaired, one stanchion at the fore part of the fore hatch being found in a very bad state was repaired. Some rivets in the stanchions were also replaced. He furthermore inspected the cement in the bottom, and found the same in good condition; inspected the decks and the caulking, the masts and anchors, and all were in good condition. He further states:

"It was not possible for leakage in the poop deck to damage the cargo of the Babin Chevaye; otherwise not only the poop deck must have leaked (and this was in order as per my survey), but also the main deck must have leaked, which was also in order. The main deck is protected by the poop deck."

On cross-examination he relates that he made the general examination of the decks, examined the main deck, poop deck, and forecastle deck by sounding the seams; and, further—

"when it is stated that a deck has been examined, this means that it has been inspected from fore till aft, to starboard and to port, in such a way as to examine every part of the deck completely. This is what I mean by having inspected the decks. This inspection of the decks on the decks was completed by the inspection of the decks in the holds, where I examined underneath to see if there were no leaky rivets. I found none, and the caulking was in good order. * * * I did examine all of the seams of the main deck as explained in my answer to question No. 9. * * * I examined all the stanchions, and examined if the top and bottom rivets were tight. * * * I followed the repairs and made sure that they were done in good condition. * * * The poop deck is over a portion of the main deck, and, the main deck being caulked and in good condition, any leakage through the poop deck could not have reached the cargo unless through straining of the main deck, that also had leaked; but, as already stated, when the vessel sailed the

caulking both of the poop deck and of the main deck was in good and sea-worthy condition."

Baines testifies that he found her decks tight from below and on deck.

"I was on the lookout for any suspicious places or signs, but found her caulking good, and decks generally in good condition. * * * I found nothing wrong with stanchions, and no rivets in them deficient. * * * She was in good condition and appeared to be seaworthy."

On cross-examination, he says:

"Whenever and wherever the main deck was clear, I would look at the seaming, and if any place looked suspicious, would try it with my knife, and, where covered with crew's quarters, would get inside and see whether the seams were filled."

And, further:

"My examination was made more particularly in order to be conscientiously enabled to certify that her caulking was good and her decks tight for the intended voyage. I was instructed in order to make sure that the vessel was thoroughly seaworthy before her voyage as to stowage of cargo."

This testimony indicates quite clearly the care that was taken by the master and the representatives of the Bureau Veritas to determine whether the Babin Chevaye was seaworthy before she entered upon her voyage. It further appears that the decks were caulked with oakum and putty; the captain preferring putty for the purpose. Hot weather has the effect to dry out both these ingredients. While in the Equator, and soon after passing that region, the captain discovered a few leaks in the seams of the poop deck, which were repaired at sea, by which the deck was again rendered water tight. Prior to this time the vessel had not encountered severe weather, the first experience being on April 18th in latitude 43 degrees south. On this day the sea ran high, and the deck was constantly covered with water. Again on the 29th the wind was strong, the waves continuously broke over the ship, and the deck was constantly full. On May 1st the vessel experienced severe strain because of the violence of the sea; the deck was constantly swept by the sea, causing fears for the safety of the cargo. This condition of the water and sea continued on the 2d. Again on the 4th the wind was strong, quoted in the log as nine; the maximum being 12. And on the 5th the storm continued, heavy seas breaking over the ship so that the deck was constantly full from starboard to portside. At 5 p. m. the storm increased in violence, the seas covering the deck from one end to the other, so that it became necessary to allow the ship to sail with the waves. On the 6th the storm yet increased to great severity, which will be noted later, but up to this time the pumps were absolutely clear, indicating that no water of any proportions had entered the vessel.

When the vessel arrived in Portland it was discovered that some of the iron and steel, and about 224 barrels of the cement, had been damaged by sea water; the amount of damage being light as compared with the entire cargo, aggregating $1,491.25. None of the other more perishable merchandise of which the cargo was composed seems to have been materially injured.

Captain Hoben, a marine surveyor for the San Francisco Underwriters, made survey of the vessel after her arrival in Portland, and required that her decks be recaulked before he would give a certificate of seaworthiness. He says he did not find her in good enough condition to satisfy·him, and that the main deck was soft in general, it being patched up considerably in places on the way out; that he went below and found leaks—

"principally all over the deck, and a great deal of water coming down from the bulwark stays, which was—the cement was cracked around the heel of them, and some rivets were loose at the time. I think some of them had been replaced, but still there was some of them loose around the bulwarks, in the heel of the bulwark stays, but the cement was away, plenty on each side."

He further testifies that after the cargo was discharged he found two beams fractured on the port side abaft of the main mast, at the inside end of the gusset. This he thinks was done on the voyage. The whole of the main deck combings of the face of the cabin and the combings of the forecastle head were gone over in making the repairs, and, as detailed by another witness, one thread, sometimes two, of the oakum used in caulking, there being 5 or 6 in number, was taken out and the seams repaired; the oakum removed having lost its texture and become decayed.

This testimony bears upon the seaworthiness of the ship at the time of sailing from Antwerp. We reserve comment until we have further examined into the testimony relating to the question whether the injuries sustained by the ship and cargo are referable to the perils of the sea, as the latter subject will further elucidate the first.

Picking up the thread of the voyage from May 5th, the captain relates that on the 6th the sea was literally mountain high; the decks were absolutely covered with water; at 7 a. m. the wind was blowing a gale, and the breakwater on the main hatch was carried away; the ship answered the helm, however, and the pumps were clear. At noon the storm abated somewhat, but at about 3:20 p. m. the vessel was caught by two tremendous waves. The first lifted the bow high out of the water, and while the stern was down, the second landed on the poop deck, broke in the steering box, broke a few spokes in the wheel, smashed the door of the chartroom, carried away everything in the chartroom, maps and everything movable. The water descended the staircase and covered all the quarters and the saloon a foot deep. Two men at the wheel were carried away; one was found a little distance off with his arm broken, and the other was swept over the entire poop deck, and recovered at the bottom of the staircase with a broken leg. The carpenter was carried away, and was found near the rail with his legs protruding overboard and his jaw smashed. The first mate and boatswain, being near the wheel, secured it, and thus prevented the loss of the vessel. Later two men were found to be missing, and were never recovered. When the water was removed from the quarters and saloon it was found that it had leaked down from the sailroom to the between-decks. In describing how the water went through into the cargo, the witness says:

"The water came over here, over the poop deck, stove in the door of the chartroom and the wall, went down the staircase, and there was one foot here; in the aft quarters was one foot of water. The water went down the little hatch in the sailroom, and got into the between-decks, and it has dispersed itself over the entire between decks, over the steel, because in between-decks there is a large plate of iron to reinforce the vessel, and the water has followed this plate further than half the vessel—the middle of the vessel. * * * Q. State what the hatch leading down into the sailroom and the storeroom is used for. A. Nearly every moment we have to go down there, either for provisions or for sails, or for material to make repairs and at the time that this water came down the hatch—came down the staircase—one man had just opened this little hatch and was down there to get something to repair the sails that had been torn. Q. Is it possible, in the practical navigation of such a vessel as the Babin Chevaye, to keep that particular hatch battened down? A. No; we couldn't do that, because we have to pass through it too often, and it is very seldom that any water would go down there except in case of an accident. Q. What was the construction of the wall and door of the chartroom prior to the time when this storm was encountered? A. The door and wall were in good condition, and in the eight or nine years that the vessel had been at sea there had never been any damage done to it. Q. What was the condition of the wheelhouse prior to the time that this storm was encountered? A. Very good condition also, and additionally secured with ropes, tied down."

Temporary repairs were made as soon as the same could be done, which was the next day. Speaking of the door of the chartroom, witness continues:

"It is very seldom that water is shipped on the poop deck, but as it was, it was properly repaired, but probably not absolutely water tight, because the door had to be removed once in a while, whenever anybody had to pass."

On the 7th the weather improved somewhat, but the seas were still running high, and it was impossible to gain headway. On the 8th of May the gales continued, considerable rolling, the vessel strains very much, as well as the rigging and the masts, obliged to sail with the wind, and the decks are absolutely full during the entire day. At this time the pumps show about 5 centimeters, an inch and a half, of water in the hold. The weather continued on the 9th as on the 8th, the vessel strains heavily and seas break over her. On the 10th the weather improved, but the vessel still suffers from severe rolling on account of the mountain high seas which strain her. On the 12th the captain declares:

"Weather awful. Very heavy sea, taking the ship from side to side, and straining enormously the masts and rigging. Violent shocks felt through the heaving rolling, shocking ship from stem to stern. The deck is completely full. * * * I mean by that that the deck is entirely covered up to the bulwarks, and that the water runs over the hatches, and that the deck—that the vessel ships water from the lee side as well as from the off side—what do you call that?

"Mr. McCamant. The wind side."

At 9 p. m. the wind veered from west to northwest, the vessel shipped water, but in the meanwhile the poop ladder was carried away, as well as the covers to the life boats. The third tarpaulin of the main hatch was carried away, and also the tarpaulin of the main hole of the pump. The two other tarpaulins on the main hatch remained intact. The port side of the deckhouse was also indented. On the 13th the seas

were still high, and the rolling continued, the deck being completely flooded, and on the 14th the captain relates:

"The weather improves considerably, and we can get on the deck, and as soon as this was possible, I made an examination of the vessel with the officers of the watch. The cement of the stanchions around the main hatch was broken, and the bulwarks have been stove—have been bent toward the main hatch, and the majority of the rivets of the stanchions have been broken in this particular place. One had entirely parted, causing considerable leak, which had made an opening there during the 48 hours, during which time the storm lasted. * * * During this 48 hours the decks were completely flooded, and it was impossible for anybody to be on deck."

On the 15th the pumps showed 20 centimeters of water in the hold, but on the 18th they were clear. Speaking of the character of the weather between April 29th and May 20th the captain declares:

"I never saw such severe weather, and such severe storms and high seas as on that trip, particularly such a long time."

The vessel anchored at Hobart Town May 29th, where the necessary repairs were made. The captain says:

"All of the rivets and stanchions had been repaired, and in order to examine the leaks in the deck we had fire hose turned on the deck, and one of the mates was sent down in the hold to see if there was any leaks, and in those places where any leak was suspected or noticed the deck was entirely recaulked in that place."

After leaving Hobart Town severe weather was again encountered, but we need not examine as to that, as no casualties are attributed to it.

The captain further relates that in the fall of 1909 he carried a full cargo of wheat to Europe; on the return voyage he carried another to Portland, and again returned to Europe with another cargo, all by the way of Cape Horn, and experienced no damage or loss upon the voyage.

Upon cross-examination Captain Lebeaupin further testifies:

"Q. What is the name of this hatch in the storeroom which was left open? A. It is called the hatchway of the sailroom. Q. Will you point this out to the court and to me, too? A. On each side of the vessel there is a small hatch like that. Q. And were they both open? A. The one in the sailroom was open, but the other one was closed, but not secured, or not water tight.

"Mr. McCamant. Not battened down? A. Not battened down. Q. And those go through the main deck, do they? A. Yes. Q. Trace the path of the water from the big wave through the chart room—how would it reach this hatch? A. Smash in this door here, and this, the inside wall, and into the chartroom, fill up the chartroom, went down the staircase, filled up all the saloon and the apartments here and the storeroom, came down this little hatch into the sailroom, and followed along the iron plates there between decks, dispersed in the hold. Q. Now, Captain, had you anticipated all of your upper works being carried away, and the sea constantly breaking over you here, you would have had that hatch closed, wouldn't you? * * * A. If that would have happened, why the chances are that the whole vessel would have gone down. * * * Q. Well, couldn't you make those two hatches water tight? A. You would have to make changes. Q. In the ship? A. They are on the same level as the deck, so I can't put any air tightening on it unless I would nail it down, but then it would prevent me from getting down there to get my provisions. Q. No combing then? A. No."

The testimony of Captain Lebeaupin is fully and elaborately corroborated by M. A. F. Rehel, the first officer, and F. M. Greenappin, the second boatswain. We need not incumber the record further by reiteration.

[1] The libel avers and the answer admits that it was agreed under the charter party that the "barque was tight, staunch, strong, and in every way seaworthy and fitted for the voyage she was about to undertake." But it was further stipulated that the owners should not be liable for any damage sustained by the act of God, perils of the sea, and accidents of navigation. Under this charter party there can be no doubt that the owner's obligation was to furnish a seaworthy vessel. This includes proper stowage and distribution of the cargo. The obligation is not that the owner will exercise due diligence to see that the vessel is well fitted, equipped, and stowed to undergo the ordinary hazards and dangers to be anticipated, but that she is reasonably fit to undergo the intended voyage, which implies that she is tight, staunch, and strong, so as to be competent to resist all ordinary action of the sea and to prosecute and complete the voyage without damage to the cargo under deck. Dupont de Nemours & Co. v. Vance et al., 19 How. 162, 167, 15 L. Ed. 584; The Edwin I. Morrison, 153 U. S. 199, 14 Sup. Ct. 823, 38 L. Ed. 688; The Caledonia, 157 U. S. 124, 15 Sup. Ct. 537, 39 L. Ed. 644; The Carib Prince, 170 U. S. 655, 18 Sup. Ct. 753, 42 L. Ed. 1181; The Medea, 179 Fed. 781, 792, 103 C. C. A. 273; The Indrapura, 190 Fed. 711, 112 C. C. A. 351; The Ninfa (D. C.) 156 Fed. 512.

[2] Where damage to cargo has been sustained by admission of sea water into the ship during the voyage, and this fact is established, the burden is cast upon the owner, under a charter party such as has been entered into here, to show not only seaworthiness, but that the cause of damage is attributable to perils of the sea, such as come within the purview of the stipulated exceptions. This proposition we understand to be fully conceded by proctors for appellees. We have heretofore ascertained that the Babin Chevaye was seaworthy as it respects stowage and distribution. Now, as it relates to the condition of her decks, whether properly caulked and water tight and seaworthy in that respect when she set sail from Antwerp: The bad weather and turbulent seas we may say began about April 29th, although rough weather was encountered April 18th, and continued to gather in force and violence until the 6th of May, when the disaster occurred, attributable directly to the sea breaking over the poop deck. Thereafter the severity of the weather and storm abated somewhat, but again increased and continued with great turbulence and violence up to May 12th, causing the ship to labor and strain heavily. During a great portion of this interval the decks were constantly covered with water, and much of the time, it is related, the bulwarks were full with the seas, occasionally breaking from either side of the ship. It is of significance that up to the 6th, when the sea broke over the poop deck, and smashed the door of the chartroom and the wall between the staircase and the chartroom, and the water entered the room, and thence found its way into the between-decks by means

of the little hatch, no water was discovered in the hold of the ship, nor did the pumps show water therein until the 8th, the storm continuing with small abatement up to that time. The storm increased to its greatest severity on the 12th, when the weather is described as "awful; very heavy sea, taking the ship from side to side, and straining enormously the masts and the rigging," and "shocking the ship from the stem to stern," causing much damage to her in different parts. There was some abatement again on the 13th. On the 14th the men were able to go on deck. On the 15th the pumps showed 20 centimeters, about 6 inches, of water in the hold. The hold was cleared on the 18th, and remained so until the end of the voyage. On the 14th an examination of the vessel showed that the cement of the stanchions around the main hatch was broken, the rivets of the stanchions broken, one having entirely parted, causing considerable leak, which continued for 48 hours, during which time the decks were completely flooded. There were also leaks through the decks. This was tested by sending one of the mates below to ascertain whether there were any or not, and about the "places where any leak was suspected or noticed" the decks were recaulked. It is thus made to appear therefrom that the water entered the ship from three sources, namely: Down the little hatchway; through the breaking of the cement around the main hatch, including the breaking of the rivets about the stanchions, and the loss of one of them; and through the decks. It is probable that by far the larger proportion entered through the two first causes. But be that as it may, if water entered through the decks this is presumptive evidence of unseaworthiness in caulking, and the reason why the water so entered must be shown to be attributable to the perils of the sea.

As has been previously remarked, the hold of the ship was clear until after the experience of May 6th, and even until the 8th, which was two days after the water went down the little hatchway. Even then it did not appear in large amount, and it was not until after the still severer experience of May 12th that it was found in considerable quantity. Captain Hoben, a witness for respondent, in going over the ship while she was discharging and afterwards, found two beams freshly fractured. These fractures he supposes were sustained on the voyage. He found a great deal of water, as he expressed it, coming down the bulwark stays, the cement being cracked around the heel of them, and broken "away plenty on each side." He also found 20 stanchions or stays on each side of the bulwarks were loose, which he thinks were caused by the heavy straining of the ship and the bad weather. This evidence of the damages which the ship sustained, coupled with other damages shown by Lebeaupin and other witnesses, indicate unmistakably that she had undergone a severe test of her strength and endurance. And when we come to consider the care and vigilance that were exercised before the voyage was undertaken to render her fit and staunch for the service, and the great damage sustained by the ship during the storms, along with the testimony respecting the severity thereof, we are impelled to the conclusion that they were unusual, extraordinary, and not such as were ordinarily

to be anticipated within the purview of the charter party, and hence that the leakage from the decks, whatever in extent it might have been, was attributable to perils of the sea, and not to unseaworthiness in faulty caulking at the time the ship entered upon her voyage. This conclusion is supported by many cases of analogy. The Orient (C. C.) 16 Fed. 916; The Marlborough (D. C.) 47 Fed. 667; Mosle v. The Sintram (D. C.) 64 Fed. 884, affirmed 79 Fed. 1002, 24 C. C. A. 689; Ceballos et al. v. The Warren Adams, 74 Fed. 413, 20 C. C. A. 486; The Guadeloupe (D. C.) 92 Fed. 670; The Tjomo (D. C.) 115 Fed. 919; Cook v. Southeastern Lime & Cement Co. (D. C.) 146 Fed. 101.

The law applicable here is as well stated as anywhere in Ceballos et al. v. The Warren Adams et al., supra, as follows:

"Where a vessel, soon after leaving port, becomes leaky, without stress of weather, or other adequate cause of injury, the presumption is that she was unsound before setting sail. The law will intend the want of seaworthiness, because no visible or rational cause, other than a latent or inherent defect in the vessel, can be assigned for the result. But, where it satisfactorily appears that the vessel encountered marine perils which might well disable a staunch and well-manned ship, no such presumption can be invoked. And where, for a considerable time, she has encountered such perils, and shown herself staunch and strong, any such presumption is not only overthrown, but the fact of her previous seaworthiness is persuasively indicated."

The only inference to be drawn from the fact that the vessel made subsequent voyages without sustaining injury to herself or cargo is that in all probability she did not encounter like weather as on the trip in question.

As it respects the little hatch in the sailroom, there is to be found in the record no testimony that its presence in the ship, its location, or the manner of its construction, constituted faulty construction of the ship herself. We cannot assume that such is the case without proof to substantiate it. Nor do we think the fact that it was not battened down was proof of unseaworthiness. It was protected by the poop deck, and was designed and intended for frequent use while the ship was on voyage. The provisions, together with the sails, were kept in the between-decks, so that it was not only convenient, but necessary, to have this hatchway in a condition to be readily opened at almost all hours, and it seems that at the very time of the entry of water through it, it was opened for use. The very construction of the ship shows its design for such use. There were two of these hatches under the poop deck, and no water went down one of them, simply because no doors, walls, or partitions with reference to it were smashed in; nor would it have gone down this one if its protection had not been broken away. We cannot agree with counsel that a ship to be seaworthy must be so constructed that she will withstand the action of the sea and weather though all of her superstructures be carried away. Many excellent ships would be pronounced unseaworthy if such were the test.

The decree of the District Court will be affirmed.